**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA, |
| |
| Plaintiff, |
| |
| v. |
| |
| WESTERN AVENUE MEDICAL, PLLC, |
| d/b/a CHRONIC PAIN MANAGEMENT, |
| |
| Defendant. |

Case No:  1:26-cv-749 (GTS/DJS)

**COMPLAINT FOR INJUNCTIVE RELIEF**

This action seeks to enjoin ongoing violations of the Controlled Substances Act arising from the operation of Western Avenue Medical, PLLC, d/b/a Chronic Pain Management (CPM). Although Douglas Cline, M.D., formally sold CPM in 2022, his involvement in the practice did not substantively cease. Rather, Dr. Cline has continued to exercise functional control over prescribing decisions, CPM has continued to operate through the same structure and engage in substantially similar prescribing practices, and Dr. Cline has continued to derive financial benefit from those practices.

This is one of three related actions currently pending before this Court involving Dr. Cline and CPM. In the first, the United States alleged that Dr. Cline issued controlled-substance prescriptions outside the usual course of professional practice and without a legitimate medical purpose. In the second action, the United States alleged that Dr. Cline fraudulently transferred a home near Lake George to his ex-wife, Joanne Cline, after learning he was under investigation for his prescription practices and faced potential significant fines. In that action, the Court found probable cause to believe that the United States would prove in the first action that violations of

1

the Controlled Substances Act had occurred and, accordingly, granted a prejudgment writ of attachment against the home.

On December 9, 2025, at a hearing related to the second action, Dr. Cline represented in open court that he had retired from the practice of medicine, no longer saw patients, and lacked authority to do so. Contemporaneous CPM medical records contradict those representations. They show that Dr. Cline continued to direct prescribing decisions for CPM patients, including patients receiving high-dose opioid regimens, after his medical license became inactive and after he surrendered his DEA registration. The week prior to that hearing, CPM records reflect that a mid-level prescriber agreed to "send oxycodone, methadone, [and] fentanyl scripts . . . at the direction and order of Dr. Cline," demonstrating continued operational control. Records from the weeks following the hearing continue to reflect that Dr. Cline directed prescribing decisions for CPM patients, including after representing to the Court that he lacked authority to do so.

After its formal sale in 2022, CPM has continued to operate under a structure in which patients pay recurring monthly fees tied to continued access to controlled-substance prescriptions, regardless of whether discrete medical services are provided. Revenues generated through this structure are routed through entities associated with Dr. Cline and his ex-wife. From those entities, they continue to derive financial benefit, including through the use of those funds to satisfy personal obligations such as credit card expenses and litigation-related legal fees.

Taken together, these facts support continuity rather than transition. CPM continued to function as a mechanism for issuing controlled-substance prescriptions outside the bounds of professional practice, while Dr. Cline continues to exercise functional control over prescribing decisions and derive financial benefit from that activity notwithstanding his contrary representations to the Court. Unless enjoined, CPM is likely to continue this unlawful conduct,

creating an ongoing risk to public health and safety. This action seeks a permanent injunction to halt that conduct and prevent further violations of the Controlled Substances Act.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1345 because the United States is the plaintiff.

2. This Court also has jurisdiction under 28 U.S.C. §§ 1355 and 1356 and 21 U.S.C. §§ 843(f) and 882(a) because this action seeks injunctive relief to prevent and restrain violations of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1395 and 21 U.S.C. § 843(f)(2) because a substantial part of the events giving rise to this action occurred in this District. CPM operates within this District, and the conduct at issue was implemented within this District.

## PARTIES

4. Plaintiff is the United States of America.

5. Defendant Western Avenue Medical, PLLC is a New York professional limited liability company that operates a medical practice under the name Chronic Pain Management (CPM) at 43 S. Western Avenue, Glens Falls, New York 12801. Western Avenue Medical, PLLC acquired CPM in 2022 through an asset purchase agreement with Douglas C. Cline, M.D., P.C., and continues to own the practice.

## OVERVIEW OF THE ACTION

6. This action seeks to enjoin ongoing violations of the Controlled Substances Act arising from the operation of CPM.

7.  This case arises in the context of prior litigation involving CPM and Dr. Cline. In *United States v. Cline*, No. 1:24-cv-451 (GTS/DJS) (N.D.N.Y.) ("*Cline 1*"), the United States alleged that Dr. Cline issued controlled-substance prescriptions outside the usual course of professional practice and without a legitimate medical purpose. In related proceedings, *United States v. Cline*, No. 1:25-cv-1576 (GTS/DJS) (N.D.N.Y.) ("*Cline 2*"), the Court entered a writ of attachment against a residence near Lake George, in Bolton Landing, that the United States alleges Dr. Cline fraudulently conveyed to his ex-wife, Joanne Cline, shortly after learning of the Government's claims against him, and found probable cause to believe the violations alleged in *Cline 1* had merit.

8.  In the *Cline 2* proceedings, Dr. Cline represented to the Court that he had retired from the practice of medicine, no longer saw patients, and lacked authority to do so. *Cline 2*, No. 1:25-cv-1576, Tr. of Dec. 9, 2025 Hearing (Tr.), at 18:15–19:1. Contemporaneous CPM medical records contradict those representations. They reflect that Dr. Cline continued to direct prescribing decisions for CPM patients, including patients receiving high-dose opioid regimens, after his medical license became inactive and after he surrendered his DEA controlled-substances registration.

9.  CPM continues to operate under a structure in which patients are required to pay recurring monthly fees as a condition of receiving controlled-substance prescriptions, regardless of whether medical services are provided. The revenues generated through that structure are routed through entities associated with Dr. Cline and his ex-wife, from which they continue to derive financial benefit.

10.  Taken together, these allegations show that CPM continues to function as a mechanism for issuing controlled-substance prescriptions outside the usual course of professional

practice and without a legitimate medical purpose, while Dr. Cline continues to direct prescribing decisions and derive financial benefit from that activity notwithstanding his representations to the Court.

## LEGAL BACKGROUND

11.     The Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, establishes a comprehensive regulatory framework governing the manufacture, distribution, and dispensing of controlled substances.

12.     The CSA classifies controlled substances into schedules based on their potential for abuse and accepted medical use. 21 U.S.C. § 812.

13.     Controlled substances may be dispensed only pursuant to a valid prescription issued by a practitioner acting in the usual course of professional practice and for a legitimate medical purpose. 21 C.F.R. § 1306.04(a).

14.     A prescription issued outside those bounds is not valid under federal law. *Ruan v. United States*, 597 U.S. 450, 454 (2022).

15.     The responsibility for proper prescribing rests with the prescribing practitioner. 21 C.F.R. § 1306.04(a).

16.     It is unlawful to knowingly or intentionally distribute or dispense a controlled substance in violation of the Controlled Substances Act. 21 U.S.C. § 842(a)(1).

17.     Federal law requires that controlled substances be prescribed in compliance with applicable standards of professional practice, including state law governing the practice of medicine.

18.     A district court may grant injunctive relief to prevent and restrain violations of the Controlled Substances Act. 21 U.S.C. §§ 843(f), 882(a).

**FACTUAL ALLEGATIONS**

**CPM Operations and Structure**

19.    CPM operates as a medical practice that provides treatment to patients, including the prescription of controlled substances used in the management of chronic pain and related conditions.

20.    Following the purported 2022 transfer from Dr. Cline, CPM continued to operate as an established practice serving an existing patient base, with ongoing treatment relationships and prescribing protocols in place.

21.    CPM utilizes mid-level practitioners who conduct patient encounters, document clinical information, and issue prescriptions consistent with treatment plans maintained by the practice.

22.    CPM maintains systems for recording patient information and transmitting prescriptions to pharmacies.

23.    CPM requires patients seeking continued access to controlled-substance prescriptions to make recurring monthly payments.  CPM also accepts lump-sum payments covering multiple months of prescriptions, including for prescriptions issued without contemporaneous medical visits.

24.    CPM's prescribing practices include controlled substances that require careful medical oversight and adherence to accepted standards of practice.

**Dr. Cline's Continued Involvement and Direction of Prescribing**

25.    Dr. Douglas Cline is a physician who previously owned and operated CPM and who remains associated with the practice following its sale in 2022.

26.    In proceedings before this Court, Dr. Cline represented that he had retired from the practice of medicine in August 2025, had stopped seeing patients, and lacked authority to continue to do so. *Cline 2*, No. 1:25-cv-1576, Tr. of Dec. 9, 2025 Hearing, at 18:15–19:1.

27.    At that time, his medical license was inactive and he had surrendered his DEA registration.

28.    CPM records contradict his in-court representations. They reflect that Dr. Cline continued to direct prescribing decisions for CPM patients after August 2025, including patients receiving high-dose opioid regimens.

29.    CPM treatment notes reflect that prescriptions would be issued "at the direction and order of Dr. Cline," and identify him as an "in house consultant" and "attending physician."

30.    Dr. Cline represented his role to CPM staff as an "in-house physician consultant."

31.    CPM records reflect that Dr. Cline's involvement was specifically invoked in connection with high-dose opioid regimens, including where mid-level practitioners documented reliance on his direction because of the high dosages prescribed.

32.    Additional records reflect prescriptions for controlled substances, including oxycodone, methadone, and fentanyl, issued pursuant to instructions attributed to Dr. Cline.

33.    These records show that Dr. Cline exercised functional control over prescribing decisions after his medical license became inactive and after he surrendered his DEA registration, notwithstanding his representations to the Court in December 2025.

34.    Prescriptions issued pursuant to the direction of an individual who lacks a valid medical license and DEA registration are not issued by a practitioner acting in the usual course of professional practice and lack a legitimate medical purpose.

**Fee Structure and Patient Payments**

35.    CPM requires some patients to make recurring monthly payments as a condition of continued access to controlled-substance prescriptions.

36.    These payments are not tied to discrete medical services within each billing cycle.

37.    Such patients must maintain payment to preserve access to treatment and prescriptions.

38.    Upon information and belief, CPM maintained a cohort of approximately 21 patients referred to internally as "e-Scribe" patients. These patients paid a fixed monthly fee of approximately $190 in exchange for continued access to opioid prescriptions, including oxycodone, methadone, and fentanyl, regardless of whether they attended monthly appointments or received contemporaneous medical services.

39.    CPM records reflect that e-Scribe patients typically attended in-person appointments only at extended intervals, including approximately every three months, yet continued to receive 30-day controlled-substance prescriptions each month so long as they maintained their recurring payments. Prescriptions continued during periods when medical encounters did not occur contemporaneously with dispensing.

40.    By conditioning continued access to controlled-substance prescriptions on recurring payments rather than on individualized medical evaluation and clinical need, CPM issues prescriptions outside the usual course of professional practice and without a legitimate medical purpose.

41.    Upon learning of this practice during the Government's investigation, CPM's new owner directed staff to cease charging patients who were not receiving contemporaneous medical services. Shortly thereafter, on March 4, 2026, Joanne Cline undermined that directive and

instructed staff not to inform patients that payment was no longer required in the absence of services, stating "Please do not . . . tell patients they do not have to pay because of some new rule." She acknowledged that compliance with the new owner's directions would reduce revenue, stating that the new owner "does not want to do anything wrong, at all, even if it means we lose money."

 

42.    These communications reflect an effort to preserve a revenue stream tied to the issuance of controlled-substance prescriptions, rather than to the provision of legitimate medical care, and confirm that CPM's recurring payment structure functioned as a pay-for-prescription model.

43.     In his June 2, 2023 sworn testimony, Dr. Cline confirmed the widespread nature of opioid prescribing at CPM. When asked, "Approximately what percentage of your patients—I'm talking all Chronic Pain Management—are on opioids?" Dr. Cline responded, "Damn near a hundred percent." Cline Testimony, June 2, 2023, at 146:1-4. This testimony demonstrates that opioid prescriptions were routine and nearly universal across CPM's patient population at that time, and corroborates the ongoing pattern of controlled-substance prescribing that underpins CPM's recurring-payment structure.

44.     Upon information and belief, CPM continues to prescribe opioids to the vast majority of its patients, generating revenue tied to those prescriptions for Dr. Cline, Joanne Cline, and associated entities, reflecting continuity rather than transition in both operations and prescribing practices.

45.     These financial arrangements demonstrate that Dr. Cline continues to derive financial benefit tied to CPM's operations, notwithstanding the formal transfer of ownership of the practice.

**Financial Flows and Benefit to Dr. Cline and Associated Entities**

46.     Revenues generated from CPM's patient payments are routed through entities associated with Dr. Cline and his ex-wife, Joanne Cline.

47.     Following the 2022 sale of CPM, Dr. Cline and Joanne Cline maintained financial arrangements connected to CPM's operations through affiliated entities, notwithstanding the formal transfer of ownership to Western Avenue Medical, PLLC.

48.     This arrangement violates New York State's prohibition on medical practitioners splitting fees with non-practitioners, N.Y. Educ. Law §§ 6530.19; 6509-a, which are designed to

prevent unlicensed persons from influencing medical decision-making.[1]

49.     CPM's recurring patient payments described above constitute a significant source of revenue associated with the operation of the practice.

50.     CPM funds were used to pay legal fees incurred by Dr. Cline in connection with the *Cline 1* litigation as recently as December 30, 2025.

51.     Moreover, funds derived from CPM's operations were routinely used to satisfy Dr. Cline and Joanne Cline's personal credit card expenses until January 2026.

52.     These arrangements reflect an ongoing financial connection between Dr. Cline and CPM's operations through which he continues to derive benefit and maintain economic linkage to the practice notwithstanding its formal sale.

**Representative Patient Examples**

53.     CPM's prescribing practices are reflected in the treatment of individual patients who received controlled-substance prescriptions under the framework described above.

54.     CPM records reflect that certain patients received ongoing prescriptions for controlled substances, including opioid medications such as oxycodone, methadone, and fentanyl, over extended periods of time.

55.     These prescribing practices occurred throughout the relevant period, including both before and after August 2025, when Dr. Cline's medical license was no longer active and he had surrendered his DEA controlled-substances registration, demonstrating continuity of conduct across that transition.

56.     In connection with those prescriptions, CPM treatment notes document that mid-

---

[1] https://www.health.ny.gov/health_care/medicaid/redesign/dsrip/docs/2015-11-10_reg_impact_vbp_issue_…

level practitioners issued controlled substances at the direction and order of Dr. Cline, who was identified in those records as an "in house consultant" and "attending physician."

57.    For example, CPM records from October through December 2025 state that prescriptions for oxycodone, methadone, and fentanyl were issued "at the direction and order of Dr. Cline," showing that the treating mid-level practitioner did not make prescribing decisions alone.

58.    CPM records further reflect that such prescriptions were issued in connection with ongoing treatment relationships, rather than isolated encounters, and were maintained through recurring documentation and continued patient participation in the practice.

59.    CPM patients receiving these prescriptions were subject to the practice's recurring payment structure, requiring continued monthly payments to maintain access to controlled-substance prescriptions.

60.    In some instances reflected in CPM records, patients did not receive contemporaneous in-person medical services corresponding to the issuance of controlled-substance prescriptions, while prescriptions for opioids and other controlled substances continued to be issued as part of ongoing treatment plans.

61.    CPM treatment documentation indicates that prescribing decisions were coordinated through repeated communications and instructions from Dr. Cline, as reflected in contemporaneous patient charts.

62.    These records reflect continuation of high-dose opioid regimens under conditions in which treatment decisions were documented as being directed by Dr. Cline, including during the period after August 2025 when he no longer maintained an active medical license or DEA registration.

Patient A

63.     Patient A has been a CPM patient since 2014 and his medical records demonstrate consistent struggles with drug addiction and overuse issues. Throughout his treatment, CPM's medical records reflect that mid-level providers were prescribing high dosages of opioids and other controlled substances to Patient A at Dr. Cline's direction.

64.     CPM's medical records also reflect that Patient A received monthly prescriptions, but attended appointments at intervals of three months or more. On those occasions when Patient A attended an appointment, he paid lump sums to cover the prescriptions he received over several months.

65.     Dr. Cline continued directing Patient A's prescription regimen after August 2025 when Dr. Cline was no longer authorized to practice medicine or prescribe controlled substances. An excerpt from December 2, 2025 reflects that "Patient spent his visit discussing his condition with Dr. Cline, in house consultant" and that "due to the very high dosages of medication this patient is on," the mid-level provider who signed the prescriptions did so "expressly at the direction of Dr. Cline who has chosen dosages and medications." On that date, this patient was prescribed Oxycodone 30mg, methadone 10mg, and fentanyl patches 10 mcg/hr.

> **Chronic Pain Management**
> 43 S. Western Ave
> Glens Falls, New York 12801
> Phone 518-223-0812   Fax 518-223-0813

| ████████ | (DOB: ████████ ) ██ | | Dec 02, 2025 Tue 10:52 AM |
| --- | --- | --- | --- |
| CC | Chronic RA pain | | |
| HPI | Patient has been stable on current regimen. Patient has been hospitalized with multiple episodes of what sound like RIND per Dr. Cline, now taking Eliquis. Patient spent his visit discussing his condition with Dr. Cline, in house consultant. Patient is unable to come into the office today. As the patient is in good standing with our practice, their prescriptions will be sent to their usual pharmacy. There is minimal risk for addiction and diversion with this patient. More harm than good would occur if the patient did not receive their prescriptions through our office today. Patient offers no other acute complaints. Medication dosages were discussed and confirmed with the attending physician, Dr. Cline, who directed this provider to send the prescription(s) to the pharmacy. Patient reports no changes to review of systems since last visit unless otherwise noted. | | |
| | Due to the very high doses of medication this patient is on, all prescriptions are sent expressly at the direction of Dr. Cline who has chosen dosages and medications. | | |

Patient B

66.    Patient B has been a CPM patient since 2013 and demonstrated a consistent problem with drug addiction and overuse. For example, in February 2025, Patient B was found to have used unprescribed hydrocodone, which CPM prescribers did not address.

67.    Patient B attended in-office appointments every three months and paid lump sums to cover the prescriptions she received in the intervening months.

68.    Dr. Cline continued directing Patient B's prescription regimen after August 2025 when Dr. Cline was no longer authorized to practice medicine or prescribe controlled substances. CPM records dated October 7, 2025 reflect continued direction by Dr. Cline.

> 7.  Medication selections and dosages have been established by Dr. Cline, attending physician based on symptoms, tolerance expectations, PDR information/manufacturer guidelines, and experience. This provider is continuing established care regimen as set forth by the attending physician.  As the patient is on higher doses of pain medication, medication dosages were discussed and confirmed with the initiating provider, Dr. Cline prior to sending any prescriptions today.
> 8.  As the patient is on higher doses of pain medication, medication dosages were discussed and confirmed with the initiating provider, Dr. Cline prior to sending any prescriptions today.

69.    After Dr. Cline represented in open court on December 9, 2025 that his medical license was inactive and stated: "I can't see patients," "I can't even consult with any patients," "I don't see patients at all," and "I'm retired",[2] CPM's medical records show his continued involvement with the medical care of Patient B.

70.    For example, CPM's medical records from December 30, 2025 reflect that Dr. Cline remained the "attending physician" for Patient B and, "as the patient is on higher doses of pain medication," the mid-level provider who signed the prescriptions "discussed and confirmed with the initiating provider, Dr. Cline prior to sending any prescriptions today." On that date, the patient was prescribed Oxycodone 30mg.

---

[2] *Cline 2*, Tr. of Dec. 9, 2025 Hr'g at 18:22–19:1, 19:8, 23:10–11.

14

| (DOB:          )  | Dec 30, 2025 Tue 08:52 AM |
|---|---|

patient has good insight and feels that the benefit of taking this medication outweighs the risks.
3. Continue sleep aid medications as prescribed through  her psychiatrist ███████████ .
4.  Continue venlafaxine 50 mg for relief of depression, as prescribed by her psychiatrist.
5.  Despite the patient being at low risk for opioid overdose, for safety purposes, Narcan was prescribed and filled 08/13/24 for emergency treatment of opioid overdose.
6.  Success of this treatment plan to be determined by monthly review and assessment of the patient's reported pain control and function as well as physical examination findings.
7.   Medication selections and dosages have been established by Dr. Cline, attending physician based on symptoms, tolerance expectations, PDR information/manufacturer guidelines, and experience. This provider is continuing established care regimen as set forth by the attending physician.  As the patient is on higher doses of pain medication, medication dosages were discussed and confirmed with the initiating provider, Dr. Cline prior to sending any prescriptions today.
8.   As the patient is on higher doses of pain medication, medication dosages were discussed and confirmed with the initiating provider, Dr. Cline prior to sending any prescriptions today.

71.     Upon information and belief, these practices were not limited to isolated patients but occurred across multiple patient charts maintained by CPM during the relevant period.

## SUMMARY OF UNLAWFUL CONDUCT

72.     CPM has functioned as a mechanism for issuing controlled-substance prescriptions outside the usual course of professional practice and without a legitimate medical purpose.

73.     CPM's prescribing practices were not isolated or sporadic. They reflect a recurring pattern across multiple patients, documented in CPM treatment records and implemented through mid-level practitioners acting under instructions, practices, and protocols established by Dr. Cline.

74.     CPM records reflect that controlled-substance prescriptions, including high-dose opioid regimens, were issued in circumstances where treatment decisions were directed by Dr. Cline, as recorded in patient charts identifying him as an "in house consultant" and "attending physician."

75.     These practices continued across the relevant period, including after August 2025, when Dr. Cline's medical license was no longer active and he had surrendered his DEA controlled substances registration.

76.    CPM's internal documentation reflects that prescribing activity was coordinated through recurring treatment notes and directives attributed to Dr. Cline, including during periods when he lacked a valid medical license and DEA registration. In those circumstances, prescribing decisions were not the product of independent professional judgment by a licensed practitioner in any meaningful sense. The resulting prescriptions fall outside the usual course of professional practice and lack a legitimate medical purpose.

77.    CPM further required patients seeking controlled-substance prescriptions to make recurring payments as a condition of continued access to treatment.

78.    Those payments functioned as a continuing condition for maintaining access to controlled-substance prescriptions. As implemented, the structure reflects that prescribing decisions were driven by continued payment rather than legitimate medical judgment, and therefore fall outside the usual course of professional practice and lack a legitimate medical purpose.

79.    CPM's financial structure directs revenues through entities associated with Dr. Cline and Joanne Cline, through which they continue to receive financial benefit tied to the operation of the practice.

80.    CPM records indicate that funds generated through patient payments were used to satisfy personal obligations associated with Dr. Cline and Joanne Cline, including credit card expenses and litigation-related costs.

81.    Taken together, CPM's prescribing practices, payment structure, and financial arrangements reflect a continuing scheme in which controlled-substance prescriptions are issued in exchange for recurring payments and under the direction of Dr. Cline, notwithstanding the formal transfer of ownership.

82.     This pattern reflects ongoing conduct that falls outside the bounds of legitimate medical practice and supports a finding of violations of the Controlled Substances Act.

83.     The United States therefore seeks injunctive relief to halt this conduct and prevent further violations.

**FIRST CLAIM FOR RELIEF**
**Injunctive Relief Pursuant to 21 U.S.C. § 843(f)**

1.     The United States repeats the allegations set forth above as if fully set forth herein.

2.     From at least August 2022 to the present, CPM, through its practitioners and agents, has issued prescriptions for controlled substances, including opioids, that were not issued for a legitimate medical purpose and were not issued in the usual course of professional practice, in violation of 21 C.F.R. § 1306.04(a) and 21 U.S.C. §§ 829 and 842(a)(1).

3.     These unlawful prescriptions include, among other things, prescriptions issued pursuant to a pay-for-prescription model in which patients were required to make recurring or lump-sum payments as a condition of receiving controlled substances, including where no bona fide medical services were provided.

4.     Since at least September 2025, CPM has further violated the Controlled Substances Act by issuing controlled-substance prescriptions at the direction of an individual who lacked an active medical license and DEA registration, thereby eliminating the exercise of independent professional judgment by a licensed practitioner and rendering such prescriptions outside the usual course of professional practice and without a legitimate medical purpose.

5.     As a result of the foregoing, CPM is liable for injunctive relief pursuant to 21 U.S.C. § 843(f).

**SECOND CLAIM FOR RELIEF**
**Injunctive Relief Pursuant to 21 U.S.C. § 882(a)**

6.    The United States repeats the allegations set forth above as if fully set forth herein.

7.    CPM has engaged, and continues to engage, in acts and practices that violate the Controlled Substances Act, including issuing controlled-substance prescriptions that are not for a legitimate medical purpose and not in the usual course of professional practice, in violation of 21 C.F.R. § 1306.04(a) and 21 U.S.C. §§ 829 and 842(a)(1).

8.    Absent injunctive relief, CPM is likely to continue to violate the Controlled Substances Act.

9.    As a result of the foregoing, CPM is liable for injunctive relief pursuant to 21 U.S.C. § 882(a).

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff the United States of America, respectfully requests that the Court grant the following relief:

1.    Enter a permanent injunction enjoining CPM, its officers, agents, servants, employees, attorneys, consultants, contractors and all persons in active concert or participation with it, from violating the Controlled Substances Act, 21 U.S.C. § 801 et seq., including by dispensing, distributing, or prescribing controlled substances outside the usual course of professional practice and without a legitimate medical purpose, in violation of 21 U.S.C. § 829 and 21 C.F.R. § 1306.04.

2.    Enjoin CPM from directly or indirectly facilitating, assisting, directing, supervising, or participating in any arrangement, entity, or practice that results in the unlawful dispensing of controlled substances, including through the use of intermediaries or third parties.

3.    Enjoin CPM from allowing any individual to exercise functional control over

18

prescribing decisions or treatment protocols that result in the issuance of controlled substances in violation of federal law.

4. Enjoin CPM from engaging in any conduct that would circumvent or evade compliance with the Controlled Substances Act, including through structural, financial, or operational arrangements that enable or conceal unlawful prescribing practices, to include any financial arrangements that violate New York State law.

5. Order such affirmative equitable relief as the Court deems necessary and appropriate to prevent recurrence of unlawful conduct and to ensure compliance with the Controlled Substances Act.

6. Grant such additional relief as the Court deems just and proper, including any other injunctive measures within the Court's equitable authority to prevent ongoing and future violations of federal law.

7. Award Plaintiff its costs and such other relief as the Court deems appropriate.

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney


By: */s/ Christopher R. Moran*
Christopher R. Moran
Adam J. Katz
Assistant United States Attorneys
Bar Roll Nos. 700767, 517894
U.S. Attorney's Office
445 Broadway, Ste. 218
Albany, NY 12207
christopher.r.moran@usdoj.gov
adam.katz@usdoj.gov